**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 19-23649 (RDD) |
| PURDUE PHARMA L.P., et al., | Chapter 11 |
| Debtors | |
| PURDUE PHARMA L.P., et al. | Jointly Administered |
| Plaintiffs,<br>v. | Adv. Case No. 21-07005-rdd |
| AIG SPECIALTY INSURANCE COMPANY (F/K/A AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY), et al., | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE
ARBITRATION INSURERS' JOINT MOTION TO STAY
THE CLAIMS AGAINST THEM IN THE ADVERSARY
<u>PROCEEDING IN FAVOR OF ARBITRATION</u>**

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................ - 1 -

ARGUMENT ..................................................................................................................... - 4 -

I.      Plaintiffs Failed To Demonstrate That This Insurance Coverage Dispute Is A
        Core Proceeding.......................................................................................................- 4 -

        A.      The Debtors' Reorganization Does Not Depend On The Outcome Of
                Plaintiffs' Claims Against The Arbitration Insurers .................................... - 6 -

        B.      Plaintiffs Grossly Overstate The Potential Amount Of Insurance
                Coverage Potentially Available In Their Claims Against The
                Arbitration Insurers...................................................................................... - 8 -

        C.      The Arbitration Insurers' Potential Coverage Defenses Do Not Make
                The Claims Core ......................................................................................... - 10 -

II.     Even If Plaintiffs' Claims Were Deemed Core, Plaintiffs Failed To
        Demonstrate That Arbitration Would Necessarily Jeopardize The Objectives
        Of The Bankruptcy Code ....................................................................................... - 12 -

CONCLUSION................................................................................................................. - 17 -

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*14 Penn Plaza LLC v. Pyett*,
    556 U.S. 247 (2009)................................................................................................14

*In re Cardali*,
    No. 10-3531 (SHL), 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010)......................4

*Cavaliere v. New Jersey Ins. Underwriting Ass'n*,
    653 N.Y.S.2d 692 (App. Div. 1997) ...............................................................................16

*In re Century 21 Dep't Stores, LLC*,
    Case No. 20-01222 (Bankr. S.D.N.Y., Feb. 18, 2021) .....................................................7

*In re County Seat Stores, Inc*.,
    No. 01 Civ. 2966, 2002 WL 141875 (S.D.N.Y. Jan. 31, 2002).........................................5

*Credit One Financial v. Anderson (In re Anderson)*,
    553 B.R. 221 (S.D.N.Y. 2016).........................................................................................15

*DeWitt Rehab. & Nursing Ctr. v. Columbia Cas. Co.*,
    464 B.R. 587 (S.D.N.Y. 2012).............................................................................................5

*In re DPH Holdings Corp*.,
    448 F. App'x. 134 (2d Cir. 2011) .......................................................................................5

*In re Hagerstown Fiber Ltd. P'Ship*,
    277 B.R. 181 (Bankr. S.D.N.Y. 2002)...............................................................................1

*Kerusa Co. v. W10Z/515 Real Estate Ltd. P'ship*,
    No. 04 Civ. 708 (GEL), 2004 WL 1048239 (S.D.N.Y. May 7, 2004) ...............................4

*MBNA Am. Bank N.A. v. Hill*,
    436 F.3d 104 (2d Cir. 2006)........................................................................................1, 12

*In re MF Global Holdings Ltd.*,
    569 B.R. 544 (Bankr. S.D.N.Y. 2017)..............................................................................16

*In re MF Global Holdings Ltd.*,
    571 B.R. 80 (Bankr. S.D.N.Y. 2017)..............................................................................5, 7

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)........................................................................................................14

*Mt. McKinley Ins. Co. v. Corning Inc.*,
    399 F.3d 436 (2d Cir. 2005)...................................................................................5, 11

*Norkin v. DLA Piper Rudnick Gray Cary, LLP*,
    No 05 CIV. 9137, 2006 U.S. Dist. LEXIS 14254 (S.D.N.Y. Mar. 31, 2006) ...................5

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2d Cir. 1993).......................................................................................7

*In re Residential Cap., LLC*,
    563 B.R. 756 (Bankr. S.D.N.Y. 2016) ..................................................................1, 5, 16

*Roman Catholic Diocese of Rockville Ctr., N.Y. v. Arrowood Indem. Co*.,
    No. 1:20-cv-11011-VEC, 2021 WL 1978560 (Bankr. S.D.N.Y. May 17, 2021)..4, 5, 7, 11

*Steadfast Ins. Co. v. Purdue Frederick Co.*,
    No. X08CV020191697S, 2006 WL 2004984 (Conn. Super. Ct. May 18, 2006)...............9

*In re Stone & Webster, Inc.*,
    367 B.R. 523 (D. Del. 2007)......................................................................................5

*In re Thorpe Insulation Co*.,
    671 F.3d 1011 (9th Cir. 2012) ................................................................................10, 11

*In re U.S. Lines, Inc.*,
    197 F.3d 631 (2d Cir. 1999)........................................................1, 4, 5, 7, 11, 12, 13, 14

## Statutes

9 U.S.C. § 1 *et seq*.....................................................................................................1

9 U.S.C. § 2................................................................................................................1

9 U.S.C. § 201 *et seq*..................................................................................................1

## Other Authorities

Fed. R. Bankr. P. 7012................................................................................................1

New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ...........1

The undersigned Defendant Insurers ("Arbitration Insurers") respectfully submit this reply memorandum of law in further support of their Joint Motion to Stay The Claims Against Them in The Adversary Proceeding in Favor of Arbitration ("Arbitration Motion"), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, § 201 *et seq.,* and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.[1]

## PRELIMINARY STATEMENT

Plaintiffs cannot dispute the well-established law governing this Arbitration Motion.  Under the FAA, written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.[2] Accordingly, "the presumption in favor of arbitration generally will trump the lesser interest of the bankruptcy courts in adjudicating non-core proceedings,"  *In re Residential Cap., LLC*, 563 B.R. 756, 767 (Bankr. S.D.N.Y. 2016) ("*ResCap*") (internal citation omitted), and Plaintiffs bear the burden to demonstrate otherwise, *see id.* at 767; *In re Hagerstown Fiber Ltd. P'Ship*, 277 B.R. 181, 198 (Bankr. S.D.N.Y. 2002).  "[E]ven as to core proceedings, the bankruptcy court will not have discretion to override an arbitration agreement unless it finds that the proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with the Arbitration Act or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code." *MBNA Am. Bank N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006) (citing *In re U.S. Lines, Inc.*, 197

---

[1]    The Arbitration Insurers do not consent to entry of final orders or judgment by the Bankruptcy Court.  *See* Fed. R. Bankr. P. 7012.

[2]    With the exception of three policies, which are addressed in a concurrently-filed Reply Memorandum of AIG Specialty Insurance Company, Evanston Insurance Company and Ironshore Specialty Insurance Company in Support of the Arbitration Insurers' Joint Motion to Stay the Claims Against Them in the Adversary Proceeding in Favor of Arbitration, Plaintiffs do not dispute that the policies issues by the Arbitration Insurers ("Arbitration Policies") constitute binding agreements to arbitrate their claims.

F.3d 631, 640 (2d Cir. 1999)).  Plaintiffs have failed to carry their heavy burden.

Plaintiffs' claims are not core.  The Opposition does not argue that insurance recoveries played any significant role in the development of the Debtors' plan.  And indeed, the proposed reorganization of the Debtors does not in any way depend on the resolution of Plaintiffs' claims. The Opposition does not dispute that the plan can be confirmed, and post-reorganization commitments to creditors can be kept, even if Plaintiffs do not recover a penny in insurance proceeds.  Accordingly, Plaintiffs are left to argue that their claims must be core because, according to Plaintiffs, they present the possibility of adding billions of dollars to the estate.  But the Second Circuit has made clear that the possibility of augmenting the estate alone is not enough to transform otherwise non-core claims into core claims, a guiding principle that Plaintiffs' Opposition simply ignores.

Moreover, the Court need not credit Plaintiffs' unsupported valuation of their claims.  The Opposition omits any explanation of how Plaintiffs valued the Debtors' total insurance claims at $3.3 billion, and does not even attempt to quantify the value of the subset of the Debtors' claims against the Arbitration Insurers, which are the only claims that matter for purposes of this motion. Nor should the Court credit Plaintiffs' $3.3 billion valuation of all the insurance assets, as evidenced first and foremost by the fact that potential insurance recoveries as an asset of the Debtors played little or no role in the Purdue bankruptcy case before the Complaint was filed.  This is not surprising because, as Plaintiffs well-know, the Debtors' insurance policies have not provided products liability coverage for opioid claims for two decades.  Moreover, the insurance claims are nowhere near the most significant asset of the estate.  The Debtors' disclosure statement currently estimates that the plan will provide nearly $6 billion to fund various creditor trusts, and further leave the reorganized debtor owned by certain of the creditor trusts.  *See* Dkt. 2825, Disclosure Statement for

Second Amended Chapter 11 Plan for Purdue Pharma L.P. and its Affiliated Debtors ("Disclosure Statement for Second Amended Plan"), at 2-3.   In short, Plaintiffs' argument that this case is core based on their dubious allegation of the amount of insurance at issue is both legally irrelevant and factually unsupported.

Even if Plaintiffs' claims were deemed core, those claims are not based on provisions of the Bankruptcy Code, and thus Plaintiffs must show that arbitrating them would necessarily jeopardize objectives of the Code.   Plaintiffs have failed to make that showing as well.   They argue that arbitration would be time-consuming and expensive.   But Plaintiffs cite no law holding that, even if true, this would jeopardize the objectives of the Code where, as here, the reorganization does not depend on insurance recoveries.   They also ignore the many characteristics of binding arbitration that in fact make it more efficient, which is one of the reasons parties agree to arbitration in the first place.   Nor do Plaintiffs explain why, if time was so important to the objectives of the Code, they waited more than 16 months after filing for bankruptcy to commence this adversary proceeding.

Plaintiffs' argument that arbitration could result in inconsistent rulings is equally unavailing. There is always the possibility of inconsistent results when a policyholder chooses to buy policies containing arbitration provisions from several different insurers.   In any event, the Court considers this factor only in connection with a debtor's request to stay an arbitration, a position Plaintiffs have not taken and presumably would not take, given their avowed concern about timing.   Finally, Plaintiffs' argument about coverage defenses the Arbitration Insurers might one day raise in an arbitration is rank speculation.   And Plaintiffs do not explain how those potential defenses would put at risk a Bankruptcy Code objective, where potential insurance recoveries play such a small role in the plan.

The Debtors entered binding contracts to arbitrate the very claims they have filed in this adversary proceeding.  The fact that the three Plaintiffs in this case now believe arbitration is inconvenient for them is insufficient reason to override the FAA and the strong policy in favor of enforcing the Debtors' contractual agreements to arbitrate.

## ARGUMENT

### I.    PLAINTIFFS FAILED TO DEMONSTRATE THAT THIS INSURANCE COVERAGE DISPUTE IS A CORE PROCEEDING.

"[W]hether a contract proceeding is core depends on (1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization."  *In re Cardali*, No. 10-3531 (SHL), 2010 WL 4791801, at *7 (Bankr. S.D.N.Y. Nov. 18, 2010) (citing *In re U.S. Lines*, 197 F.3d at 637).  "[A] proceeding is non-core if it exists independently under state law and is merely 'related to' the bankruptcy case because of a conceivable effect upon the debtor's estate."  *Kerusa Co. v. W10Z/515 Real Estate Ltd. P'ship*, No. 04 Civ. 708 (GEL), 2004 WL 1048239, at *2 (S.D.N.Y. May 7, 2004).  Claims brought under pre-petition contracts "are usually non-core."  *Roman Catholic Diocese of Rockville Ctr., N.Y. v. Arrowood Indem. Co*., No. 1:20-cv-11011-VEC, 2021 WL 1978560, at *5 (Bankr. S.D.N.Y. May 17, 2021).

Plaintiffs do not dispute that the Arbitration Policies are antecedent to the reorganization petition, or that their claims are brought under state and other law, not under the Bankruptcy Code. Plaintiffs nevertheless argue that "the Adversary Proceeding is core because it is inextricably intertwined with the reorganization and directly 'affect[s] a core function of this Court which is 'administering all property in the bankrupt's possession.'"  Plaintiffs' Opposition ("Opp.") at 17. This assertion betrays a misunderstanding of the well-established rules by which a proceeding is adjudged core or non-core.  *See* Arbitration Motion, at 16-17 (setting out standards).  Most

fundamentally, "claims are not rendered core simply because they involve property of the estate." *U.S. Lines*, 197 F.3d at 637.  If the only test were whether an insurance coverage claim involved property of the estate, every insurance coverage claim would be deemed core, and in point of fact most insurance coverage claims are not core claims.  *See, e.g., ResCap*, 563 B.R. at 770-73; *In re MF Global Holdings Ltd.*, 571 B.R. 80, 94-95 (Bankr. S.D.N.Y. 2017) ("*MF Global*"); *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 450 (2d Cir. 2005); *Roman Catholic Diocese of Rockville Ctr.*, 2021 WL 1978560, at *5-8; *DeWitt Rehab. & Nursing Ctr. v. Columbia Cas. Co.*, 464 B.R. 587, 591-93 (S.D.N.Y. 2012); *In re Stone & Webster, Inc.*, 367 B.R. 523, 527-29 (D. Del. 2007).

Plaintiffs thus are mistaken in asserting that "courts in this Circuit consistently have held that adversary proceedings to determine insurance coverage are core."  Opp. at 19 (citing *Norkin v. DLA Piper Rudnick Gray Cary, LLP*, No 05 CIV. 9137, 2006 U.S. Dist. LEXIS 14254 (S.D.N.Y. Mar. 31, 2006)); *In re DPH Holdings Corp.*, 448 F. App'x. 134 (2d Cir. 2011); *In re County Seat Stores*, *Inc.*, No. 01 Civ. 2966, 2002 WL 141875 (S.D.N.Y. Jan. 31, 2002)).  *Norkin* is not an insurance coverage action, and in any event involved claims arising out of post-petition legal advice.  2006 U.S. Dist. LEXIS 14254 at *9-10.  *DPH Holdings* involved an adversary proceeding brought by a workers' compensation insurer, in part under post-petition contracts, which in any event had to be allowed or disallowed in the bankruptcy.  448 F. App'x. at 135-37.  *In re County Seat Stores* involved a claim by a debtor's trustee under a D-&-O policy seeking to establish that the debtor's former directors and officers were entitled to coverage for damages and expenses relating to the same trustee's claims against them in an adversary proceeding in the bankruptcy, in a circumstance where the insured directors and officers were indemnified by the debtor.  2002 WL 141875 at *2.  Thus, the outcome of the insurance case would also determine whether those

directors and officers had a claim against the debtor.  *Id*. at *6.  None of these cases supports Plaintiffs' position that their insurance claims—brought under pre-petition insurance contracts, involving no bankruptcy law issue, and seeking recoveries that would merely augment the estate— are core.

Plaintiffs' claims are prima facie not "inextricably intertwined" with the Debtors' reorganization.  On the contrary, the Debtors' plan will be confirmed long before Plaintiffs' insurance claims are adjudicated, regardless of the forum in which they are heard, and neither the implementation nor confirmation of the plan turns on the timing or amount of insurance recoveries.

### A.     The Debtors' Reorganization Does Not Depend On The Outcome Of Plaintiffs' Claims Against The Arbitration Insurers.

The Debtors' reorganization in no way depends on, or is threatened by, the outcome of Plaintiffs' claims against the Arbitration Insurers.  Nothing in the Debtors' second amended plan alters that fact.  As before, the Debtors' insurance rights are to be assigned to the Master Disbursement Trust,[3] which will be empowered to continue to prosecute insurance claims, including against the Arbitration Insurers.  *See* Dkt. 2823, Second Amended Plan,  Section 5.6(a).  And as before, the only specific allocation of insurance proceeds described in the Plan involves the PI Trust.  *Id*., Sections 5.7(d), 5.2(d)(i)(D).  On the effective date, the PI Trust will receive $300 million in funds from the Debtors that is in no way contingent on insurance recoveries of any kind.  *Id.*, Section 1.1; *see also* Dkt. 2825, Disclosure Statement for Second Amended Plan, at 4-5, 82-83.  Following the initial funding, an additional amount between $400 and $450 million will be disbursed to the PI Trust in installments.  Dkt. 2823, Second Amended Plan, Section 5.2(d)(i)(D).

---

[3] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Dkt. 2823, Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors ("Second Amended Plan" or "Plan")

Those funds may come from certain insurance recoveries ("Bermuda Form Policies"). [4] *Id.*, Section 5.2(d)(i)(D). If more than $450 million is recovered in those specified insurance proceeds, the additional funds will be distributed among other creditors, according to a predetermined MDT Priority Waterfall. *Id.*, Sections 5.2(f), 5.6(b). Critically, even if there are no insurance recoveries, the PI Trust will receive an additional $400 million from the MDT in three annual installments beginning on July 30, 2024. *Id.*, Section 5.2(d)(i)(D). However, as before, insurance recoveries have the potential of augmenting disbursements to the PI Trust by no more than $50 million. *Id.*

All other insurance recoveries would be channeled into the MDT, to be applied in accordance with the MDT Priority Waterfall to pay MDT expenses and creditor claims. *Id.*, Section 5.6(b), 5.2(f)(i). The Plan does not count on recovery of any additional insurance proceeds to fund any other trust or expense.

As a review of the Plan itself shows, insurance recoveries would serve to do nothing more than augment the assets of the estate post-reorganization. That is insufficient to render the insurance claims core, as courts in this Circuit have consistently and forcefully held. *See, e.g., U.S. Lines*, 197 F.3d at 638 (Where "the insurance proceeds would only augment the assets of the estate for general distribution, the effect on the administration of the estate [is] insufficient to render the proceedings core."); *MF Global*, 571 B.R. at 94-95; Dkt. 59-1, Order Granting Defendants' Motion to Remand (Transcript of Proceedings) at 20-21, *In re Century 21 Dep't Stores, LLC*, Case No. 20-01222, (Bankr. S.D.N.Y., Feb. 18, 2021); *In re Orion Pictures Corp.*, 4 F.3d 1095, 1102 (2d Cir. 1993); *Roman Catholic Diocese of Rockville Ctr.*, 2021 WL 1978560, at *5 (that insurance

---

[4]     The principal change in the Second Amended Plan is that, rather than treat all potential insurance proceeds alike, the Plan now separately addresses recoveries under what it calls MDT Bermuda-Form Insurance Policies ("Bermuda Form Policies"). Dkt. 2823, Second Amended Plan, Section 1.1. While the Plan never fully defines that term or identifies which policies it covers, it appears to be intended to cover many of the Arbitration Policies.

represented the "single largest, but admittedly not the only available asset" was insufficient to render the proceeding core).

In their Opposition, Plaintiffs entirely fail to address this clear precedent.  Instead, in an attempt to attach some significance to their augmentation argument, Plaintiffs claim that enforcing the Debtors' agreements to arbitrate would affect the "timing" of creditor recoveries.  *See* Opp. at 20-22.  They cite no case holding that the "timing" of distributions to creditors is relevant for purposes of determining whether their claims are core.  In any event, Plaintiffs have failed to support their contention that allowing their claims to be arbitrated somehow would slow payments to creditors.  The PI Trust and the MDT will be funded from the effective date, each with $300 million in cash (with the MDT receiving the MDT Transferred Assets, entitling the MDT to $4.275 billion from the Shareholder Settlement Agreement).  *See* Dkt. 2823, Second Amended Plan, Sections 1.1, 5.2(d)(i)(D).  Plaintiffs do not attempt to demonstrate how adding additional amounts to those trusts would speed recovery to actual creditors, who in any event will not get paid until they follow the process for payment dictated by each of the trusts.  The claims of PI Trust creditors are not even due to be fully filed until five months after the confirmation date, after which they must be reviewed and approved.  Dkt. 2868, Notice of Filing of Fourth Plan Supplement, Ex. C, at 2-4.  It could take many months or years before the non-insurance funds are distributed, providing ample time for arbitration to determine the validity of Plaintiffs' claims against the Arbitration Insurers.

### B.    Plaintiffs Grossly Overstate The Potential Amount Of Insurance Coverage Potentially Available In Their Claims Against The Arbitration Insurers.

Plaintiffs' augmentation of the estate argument is as overblown as it is irrelevant.  According to Plaintiffs, the "Debtors purchased 113 liability insurance policies between 2001 and 2018 that Plaintiffs allege provide more than $3.3 billion in coverage for the Debtors' alleged liability in

connection with the Opioid Mass Tort Claims."  Opp. at 8.  Notwithstanding their burden to prove their claims are core, Plaintiffs provide no explanation of how the $3.3 billion figure was calculated.

First of all, even by Plaintiffs' reckoning, the Arbitration Policies do not provide $3.3 billion in limits.  That sum is what Plaintiffs claim to be the total limits of all the policies of all the insurers over all the years.  *See* Complaint ¶ 6.  However, the only limits relevant to this motion are the limits of the Arbitration Insurers.  Exhibit A does not reflect "113 liability insurance policies," but 113 alleged policy periods, covering approximately 80 policies.  Complaint, Ex. A.  Of those 80 policies, only 23 were issued by the Arbitration Insurers.  *See id.*

Moreover, there is nowhere near $3.3 billion in limits at issue even if one takes into account all of the insurers.  Perhaps the clearest proof of that is how the insurance claims have been treated in the bankruptcy proceedings to date.  The Debtors did not even mention this purported insurance motherlode in their Chapter 11 filings until after the commencement of this adversary proceeding more than 16 months later.  *See* Opp. at 8-9.  As demonstrated above, even now the Debtors' Plan does not count on any insurance recoveries.  If there were truly $3.3 billion of insurance at issue in the bankruptcy case, there would have been much more discussion and particularized treatment of it in the Plan.  It is not surprising that insurance recoveries do not figure into the Plan in any material way because, as Plaintiffs know, all of the Debtors' post-2001 policies contain products liability exclusions.  *See Steadfast Ins. Co. v. Purdue Frederick Co.,* No. X08CV020191697S, 2006 WL 2004984, at *6 (Conn. Super. Ct. May 18, 2006) (citing affidavit of Edward B. Mahony, [Purdue's] Executive Vice President and Chief Financial Officer, stating that Purdue policies after 2001 contained "an OxyContin exclusion"); *see also* Dkt. 29, Memorandum of Law in Support of Motion to Withdraw the Reference, at 13-14 (Policies identified by Debtors include provisions that "expressly exclude from coverage damages arising from the Debtors' opioid products.").

The truth is that Plaintiffs' unsupported allegation that there is $3.3 billion at stake in this adversary proceeding is designed to make it appear that insurance has a bigger role in this case than it actually does.

### C.    The Arbitration Insurers' Potential Coverage Defenses Do Not Make The Claims Core.

Plaintiffs are clutching at straws when they argue that the availability of coverage defenses would "put[] at issue a debtor's conduct during the bankruptcy," and that therefore this proceeding is core. Opp. at 22-26. This is pure speculation. The Arbitration Insurers have not even responded to the Complaint, let alone served a responsive pleading in an arbitration. In any case, there is no law, or reasonable argument, that the objectives of the Code would be subverted if a confidential arbitration involved coverage defenses that implicated a debtor's conduct or failure to seek consent to settle an underlying case.

To support the relevance of their assertion, Plaintiffs cite a Ninth Circuit decision, *In re Thorpe Insulation Co*., 671 F.3d 1011 (9th Cir. 2012), devoting two pages of their brief to an analysis that fundamentally misinterprets its holding. Opp. at 22-24. *Thorpe* concerned a claim by an insurer (Continental) against the debtor (Thorpe) for violation of a pre-petition settlement agreement that contained an arbitration provision; it was not an insurance coverage case brought by a debtor. *Id*. at 1014-16. Continental filed a proof of claim in Thorpe's bankruptcy, and then sought to compel arbitration under the settlement agreement. *Id*. at 1016. Continental alleged that Thorpe's conduct in preparation for its reorganization—namely, the assignment of insurance rights to a Section 524(g) trust for asbestos liability—breached the settlement agreement. *Id*. at 1016-17. Relying in part on *U.S. Lines*, the Ninth Circuit held that the Bankruptcy Code could trump the FAA there, but only after finding both that Continental's claim was a core claim, and that its claim would "conflict with the underlying purposes of the Bankruptcy Code," because it was based on

"Continental's challenge to Thorpe's efforts to seek § 524(g) relief and confirm a § 524(g) plan." *Id.* at 1021, 1023. The Ninth Circuit's determination that Continental's claims were core turned on two circumstances not present here—that Continental's claim had to be allowed or disallowed in the bankruptcy, and that it concerned the operation of a 524(g) trust. *Id.* at 1021-22. *Thorpe* does nothing to support Plaintiffs' assertion that their claims against the Arbitration Insurers are core.[5]

Plaintiffs also reference "pay first" language in some of the Arbitration Policies, arguing without elaboration that such language "implicates the Debtors' bankruptcy conduct," invoking *U.S. Lines*. Opp. at 25. However, Plaintiffs ignore the reason "pay first" language mattered in *U.S. Lines*. *U.S. Lines* held that a coverage dispute was core under the circumstances of that case because of unique risks created by the interplay of the terms of the confirmed plan and the policies' pay-first provisions. *Mt. McKinley*, 399 F.3d at 448 ("[W]e found core jurisdiction [in *U.S. Lines*] based on the mutually re-enforcing effects of two factors," only one of which was the pay-first requirement.); *accord Roman Catholic Diocese of Rockville Ctr.*, 2021 WL 1978560, at *6 (agreeing that "the holding in *U.S. Lines* was 'based on the mutually re-enforcing effects' of the insurance proceeds being the only asset available and the policies' pay-first provisions") (citing *Mt. McKinley*, 399 F.3d at 448). The insurance proceeds in *U.S. Lines* were "almost entirely earmarked for paying the personal injury claimants and represent[ed] the *only potential source of cash available* to that group of creditors." *U.S. Lines*, 197 F.3d at 638 (emphasis added); *see* Opp. at 25. Furthermore, those proceeds would not be made available until satisfaction of the pay-first requirements, for which the insured would have to use "assets earmarked for other creditors," while

---

[5]    While Plaintiffs cite *Thorpe* to argue their claims are core, the passages they cite do not relate to the court's determination that the claims in that case were core, but to whether, given they were core, there was a significant conflict with the Bankruptcy Code. Opp. at 23-24 (citing *Thorpe*, 671 F.3d at 1022).

still running the risk that the payments may not "trigger the . . . indemnification obligation," which would lead to "an inequitable distribution among the creditors." *U.S. Lines*, 197 F.3d at 638-39.

Here, by contrast, the insurance proceeds are far from the only source of cash available to creditors. The PI Trust, for example, will receive an immediate distribution of $300 million from the estate and a minimum of $700 million, even if there are no insurance recoveries. Second Amended Plan, Section 5.2(d)(i)(D). Nor would pay-first provisions in some of the Arbitration Policies create a risk of inequitable distribution given the massive size of the estate, and the payments that will be made to creditors through the trust mechanisms (assuming of course there is any coverage at all for those claims) over an extended period. In short, the mere presence of pay-first provisions in some of the Arbitration Policies does not transform this case into a core proceeding.

## II.   EVEN IF PLAINTIFFS' CLAIMS WERE DEEMED CORE, PLAINTIFFS FAILED TO DEMONSTRATE THAT ARBITRATION WOULD NECESSARILY JEOPARDIZE THE OBJECTIVES OF THE BANKRUPTCY CODE.

Plaintiffs have failed not only to prove that their claims are core, but also to establish that even if they are core, they "are based on provisions of the Bankruptcy Code that 'inherently conflict' with the Arbitration Act or that arbitration of the claim[s] would 'necessarily jeopardize' the objectives of the Bankruptcy Code." *MBNA*, 436 F.3d at 108 (internal citation omitted). Plaintiffs' claims are not based on any provisions of the Bankruptcy Code, and the Opposition does not argue otherwise. Thus, if Plaintiffs' claims are core, Plaintiffs still must show that arbitration would necessarily jeopardize the objectives of the Bankruptcy Code. The Opposition advances three arguments in an effort to make that showing: (1) arbitration would jeopardize the goal of centralizing litigation in the bankruptcy court, Opp. at 26-27; (2) arbitration "will consume estate resources and lead to delays," Opp. at 27- 30; and (3) arbitration will create a "significant risk of

inconsistent rulings," Opp. at 30-33.   None of these suggests that arbitration would seriously jeopardize the objectives of the Bankruptcy Code under the circumstances here.

Plaintiffs argue that permitting arbitration would jeopardize "the goal of centralized resolution of purely bankruptcy issues" and "the need to protect creditors and the reorganizing debtors from piecemeal litigation." Opp. at 26.  Neither of these assertions is correct or meaningful. The issues that will be decided in the arbitration are not "purely bankruptcy issues"; they are not bankruptcy issues at all.  Moreover, "by not granting the bankruptcy court exclusive jurisdiction over non-core matters, 'it is clear that in 1984 Congress did not envision all bankruptcy related matters being adjudicated in a single bankruptcy court.'" *U.S. Lines*, 197 F.3d at 640 (quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1157 (3d Cir. 1989)).  And in this case, arbitration would not have a significant effect on the reorganizing Debtors, because confirmation of the Plan does not in any way require resolution of the insurance disputes, and the litigation of Plaintiffs claims, which span twenty years and involve scores of insurance policies, will post-date the reorganization for the most part, as the Plan itself makes clear by assigning the Debtors' insurance claims to the post-reorganization MDT.  *See* Dkt. 2823, Second Amended Plan, Section 5.6(h).

Plaintiffs next assert that the costs associated with arbitration, and what they characterize as "inevitable delays," would "create an inherent conflict" with the Bankruptcy Code.  Opp. at 27-30. Plaintiffs do not cite a single case holding that cost and delay create a conflict with the Bankruptcy Code sufficient to justify overriding the FAA.  Instead, they rely on the observation in *U.S. Lines* that a core purpose of bankruptcy "is to 'allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'" Opp. at 29 (quoting *U.S. Lines* 197 F.3d at 640).

But, again, the reorganization of these Debtors is proceeding entirely independent of the process to resolve the insurance claims, and will conclude in the near term, leaving the litigation of Plaintiffs' claims as a post-reorganization matter.  Further, the Second Circuit's decision in *U.S. Lines* was not based on cost or delay, but on the risk of inequitable distribution. *See* 197 F.3d at 638.  Here, Plaintiffs cannot show that arbitration would pose any threat to the equitable distribution of assets among creditors or the implementation of the Plan, because the Plan does not depend on the recovery of one cent of insurance proceeds under the Arbitration Policies.

While Plaintiffs provide selected excerpts from treatises on the arbitration process to argue that it can be time-consuming, Opp. at 28-29, they elide key differences between arbitration and litigation that suggest the former is typically much more efficient.  For example, Plaintiffs complain that it will take time to select arbitrators, Opp. at 28, but fail to acknowledge that the Arbitration Policies place finite limits on the amount of time permitted for the parties to make their selections. *See, e.g.,* Dkt. 133-1, Declaration of Paul E. Breene in Support of Plaintiffs' Opposition ("Breene Decl."), ¶ 6 ((AISLIC Policy, Section V – Conditions, [o] Arbitration) (imposing 30-day limit)). Discovery, which is typically the most time-consuming phase of a litigation, is limited and streamlined in arbitration.[6]  *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 269 (2009) (recognizing that "arbitration procedures are more streamlined than federal litigation"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) (A party in arbitration "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.").

---

[6]     Plaintiffs' assertion that arbitration might take "years" relies on an inaccurate characterization of a passage from a treatise addressing the pre-dispute period, not the duration of the arbitration.  *See* Opp. at 29 (citing Scorey, *et al.* § 17.11; Dkt. 133-1, Breene Decl., Ex. 28).

Plaintiffs also ignore that the Arbitration Policies provide that awards are final, and therefore generally not subject to costly and time-consuming appeal, whereas any decision in this Court would be subject to further review by the District Court and the Second Circuit. *See, e.g.*, Dkt. 133-1, Breene Decl. ¶ 6 (AISLIC Policy, Section V – Conditions, [o] Arbitration) (no appeal except for fraud or gross misconduct by the arbitrators)).  The Debtors had it within their power to initiate arbitration months or years ago, and the delay they have caused by choosing to ignore their contractual obligations to arbitrate cannot be a reason to conclude that arbitration would jeopardize objectives of the Bankruptcy Code.

Plaintiffs similarly provide no authority for the proposition that the possibility of inconsistent rulings between post-reorganization coverage determinations by this Court and by arbitration panels would jeopardize objectives of the Bankruptcy Code.  Plaintiffs cite *Credit One Financial v. Anderson (In re Anderson)*, 553 B.R. 221 (S.D.N.Y. 2016), *see* Opp. at 30, 32, but *Anderson* involved arbitration of a fundamental bankruptcy law matter—the discharge of claims against a debtor.  The district court upheld the bankruptcy court's denial of the credit card company's motion to compel arbitration because "the discharge is the fundamental right of the debtor obtained in bankruptcy, as it guarantees a debtor's fresh start, which is a central purpose of the Bankruptcy Code, and that purpose should not be jeopardized by decentralized resolution of claims through arbitration." *Id.* at 230.  The district court also cited "the importance of the uniform application of bankruptcy law." *Id.* at 234.  None of these concerns is present here, where the claims involve state insurance law, not the Bankruptcy Code.

Plaintiffs' final complaint that they should not  "be *forced* to litigate many of the same facts and insurance coverage issues before this Court and simultaneously across multiple individual arbitration panels,"  Opp. at 30 (emphasis added), overlooks the obvious point that Purdue *agreed*

to arbitrate these claims. No one forced the Debtors to purchase the Arbitration Policies. The Debtors, a multi-billion dollar collection of sophisticated business entities experienced in purchasing liability insurance, knew full well that they were agreeing to arbitrate under different arbitration regimes and in different venues. The current groups of Plaintiffs cannot walk away from the Debtors' contractual obligations because in their present circumstances they feel it would be inconvenient. Of course, the Arbitration Insurers expect that the parties will work with each other and the arbitrators to minimize burdens.

In any event, while bankruptcy courts sometimes consider the challenges that might be posed by rulings on similar sets of issues by different tribunals, they do so *after* deciding that some of the related claims must be arbitrated, if the debtor moves to stay the arbitration proceedings. *See ResCap*, 563 B.R. at 773-77. Plaintiffs have made no such motion here, and having voiced concerns over purported delays that would follow from arbitration, one would not expect them to do so.[7]

---

[7]     In a footnote, Plaintiffs argue that the Arbitration Insurers, except Evanston, must post a bond under New York Insurance Law § 1213. *See* Opp. at 16, n.10. This is not the case. The Section 1213 bond requirement applies only to a foreign insurer that engages in certain enumerated acts, including "the issuance or delivery of contracts of insurance to residents of this state or to corporations authorized to do business therein." *Id*. § 1213(b)(1)(A). In *ResCap*, the court explained that the "majority approach" is that the "bases of jurisdiction enumerated in [S]ection 1213(b) . . . *all* require that the relevant policy be issued or delivered in New York." 563 B.R. at 781-82 (holding that no bond was required) (emphasis added); *see also Cavaliere v. New Jersey Ins. Underwriting Ass'n*, 653 N.Y.S.2d 692, 693 (App. Div. 1997) ("plaintiff failed to establish that the insurance policy was issued or delivered in New York" and thus Section 1213 did not apply) .

Plaintiffs have not shown that any of the Arbitration Insurers' policies were delivered in New York. Citing *MF Global*, Plaintiffs suggest that a policy is "delivered" wherever there is an insured entity covered under the policy. Opp. at 16, n.10. Again, that is not the case. The determinative factor in similar cases has been the address of the insured on the policies. The *ResCap* court found that "the address of the insured on each policy list[ed] [the insured's] Detroit, Michigan address," and therefore the policies were not delivered in New York. 563 B.R. at 782 (holding that no bond was required). The *MF Global* court, applying the same approach, found that "the insurance policy [was] addressed to [the insured's] New York address," and therefore the policies were delivered in New York. *In re MF Global Holdings Ltd.*, 569 B.R. 544, 553-54 (Bankr. S.D.N.Y. 2017) (holding that a bond was required). Applied to the facts here, both *MF Global* and

## <u>CONCLUSION</u>

For the foregoing reasons, the Arbitration Insurers respectfully request that the Court stay the claims against them in adversary proceeding in favor of arbitration, and grant such other and further relief as may be just and proper.

---

*ResCap* dictate no bond is required.  After generally having been transmitted to insurance brokers in Bermuda, *see, e.g.*, Dkt. 77-1, Affirmation of Kevin G. Costello in Support of Motion to Dismiss for Lack of Personal Jurisdiction ¶ 13, all Arbitration Policies were addressed to insureds in Connecticut or Germany, and thus those policies were not under any circumstances issued or delivered in New York.  *See, e.g.*, Dkt. 57-2, Declaration of Paul Koepff in Support of the Arbitration Motion, Ex. A (Arch Reinsurance Ltd. Policy, No. B4-UFP-03233-01, Declarations, Item 1 (addressed to Purdue Pharma L.P. in Stamford, Connecticut)).  All of the other Arbitration Policies showing that they were not delivered in New York are attached to Dkt. 57, Notice of Motion for Arbitration Insurers' Joint Motion to Stay the Claims Against Them in the Adversary Proceeding in Favor of Arbitration.  The Section 1213 bond requirement does not apply.

- 17 -

Dated: New York, New York
        May 20, 2021

**COUNSEL FOR ARBITRATION INSURERS**


**WILLKIE FARR & GALLAGHER LLP**

/s/ *Mitchell J. Auslander*
Mitchell J. Auslander
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8201
mauslander@willkie.com

Joseph G. Davis (*pro hac vice*)
1875 K. Street, NW
Washington, DC 20006-1238
(202) 303-1131
jdavis@willkie.com

*Counsel for Defendants AIG Specialty Insurance Company, American International Reinsurance Company, and New Hampshire Insurance Company*

**ABRAMS, GORELICK, FRIEDMAN & JACOBSON, LLP**

/s/ *Michael E. Gorelick*
Michael E. Gorelick
Thomas R. Maeglin
Abrams, Gorelick, Friedman & Jacobson, LLP
1 Battery Park Plaza (4th floor)
New York, NY 10004
(212) 422-1200
mgorelick@agfjlaw.com
tmaeglin@agfjlaw.com

*Counsel for Defendant Liberty Mutual Insurance Europe S.E.*

**BATESCAREY LLP**

/s/ *Kent A. Wilson*
Kent A. Wilson
Adam H. Fleischer
R. Patrick Bedell
Kristi S. Nolley
BatesCarey LLP
Suite 2400
191 N. Upper Wacker Drive
Chicago, Illinois 60606
(312) 762-3100
kwilson@batescarey.com

-- and --

**HURWITZ & FINE**

Dan D. Kohane
Lee Siegel
Hurwitz & Fine
1200 Liberty Building
Buffalo, New York 14202
(716) 849-8900

*Counsel for Defendants Chubb*
*European Group SE (formerly ACE*
*Insurance S.A.-N.V.), QBE UK Limited*
*(formerly QBE International Insurance*
*Company Limited), SR International*
*Business Company SE (formerly SR*
*International Business Insurance*
*Company Limited), Darag Insurance*
*UK Limited (formerly The Underwriter*
*Insurance Company Limited), Zurich*
*Specialties London Limited (formerly*
*Zurich Reinsurance (London) Limited)*

**IFRAH PLLC**

/s/ *George R. Calhoun, V*
George R. Calhoun, V (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
george@ifrahlaw.com

-- and --

**KENNEDYS CMK LLP**

/s/ *Christopher R. Carroll*
Christopher R. Carroll
Joshua S. Wirtshafter
(*pro hac vice application forthcoming*)
Kennedys CMK LLP
570 Lexington Avenue, 8th Floor
New York, New York 10022
(646) 625-4000
Christopher.Carroll@kennedyslaw.com
Joshua.Wirtshafter@kennedyslaw.com

*Counsel for Defendants Ironshore
Specialty Insurance Company, formerly
known as TIG Specialty Insurance
Company, and Allied World Assurance
Company, Ltd.*

**MORRISON MAHONEY, LLP**

/s/ *Arthur J. Liederman*
Arthur J. Liederman
Nicole Battisti
Nicole Khalouian
Morrison Mahoney, LLP
88 Pine Street
New York, NY 10005
(212) 825-1212

*Counsel for Defendant HDI Global SE /*
*HDI Global SE – UK as successor to*
*Gerling Konzern General Insurance*
*Company UK Branch*

**CLYDE & CO US LLP**

/s/ *Paul R. Koepff*
Paul R. Koepff
Harris Wiener
Clyde & Co US LLP
The Chrysler Building
405 Lexington Ave., 16th Floor
New York, NY 10174
(212) 710-3900

-- and --

**O'MELVENY & MYERS LLP**

Tancred Schiavoni
Maria DiConza
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NU 10036
(212) 326-2000

*Counsel for Defendant*
*Arch Reinsurance Ltd*

**DENTONS US LLP**

/s/ *Lauren Macksoud*
Lauren Macksoud
Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-5347

Patrick Maxcy (*pro hac vice* pending)
Keith Moskowitz (*pro hac vice*
pending)
Dentons US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606-6361
(312) 876-2810

-- and --

**KENNEDYS**

Richard Geddes
Kennedys
100 N Riverside Plaza, Suite 2100
Chicago, IL 60606
(312) 800-5036

*Counsel for Defendant*
*XL Bermuda Ltd.*

**CLYDE & CO US LLP**

/s/ *Daren McNally*
Daren McNally
Barbara Almeida
Harris Wiener
Matthew Gennaro
Clyde & Co US LLP
The Chrysler Building
405 Lexington Ave., 16th Floor
New York, NY 10174
(212) 710-3900

-- and --

**O'MELVENY & MYERS LLP**

Tancred Schiavoni
Maria DiConza
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

*Counsel for Chubb Bermuda Insurance Ltd*

**NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP**

/s/ *Monica T. Sullivan*
Monica T. Sullivan
Nicolaides Fink Thorpe Michaelides Sullivan LLP
10 S. Wacker Drive
Suite 2100
Chicago, Illinois 60606
(312) 585-1400

Jodi S. Green
Nicolaides Fink Thorpe Michaelides Sullivan LLP
626 Wilshire Blvd., Suite 1000
Los Angeles, California 90049
(213) 402-1248

-- and --

**GEOFFREY T. RAICHT, PC**

Geoffrey T. Raicht
Geoffrey T. Raicht, PC
1 Kittle Road
Chappaqua, New York 10514
(917) 344-0036

*Counsel for Defendant Evanston Insurance Company*